# FEDERAL DEFENDER SERVICES
## OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
**Krista A. Halla-Valdes, First Assistant**
**Joseph A. Bugni, Madison Supervisor**
**John W. Campion**
**Shelley M. Fite**
**Anderson M. Gansner**
**Gabriela A. Leija**
**Peter R. Moyers**
**Ronnie V. Murray**
**Tom E. Phillip**
**Joshua D. Uller**
**Kelly A. Welsh**

517 E. Wisconsin Avenue
Room 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

January 26, 2018

Honorable Lynn Adelman
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI   53202

RE:   *United States v. Marquille Wimberly*
      Case Nos. 17-CR-134

Dear Judge Adelman:

When you talk to Marquille Wimberly's family members, like his mother, they describe him like they would a child. And when you speak with him, you understand why. He comes across as unsophisticated, naïve, and easily distracted, even immature. And the reasons for that are biological. Specifically, Marquille is brain damaged. Before he ever stepped foot into a school, he was hospitalized repeatedly for lead poisoning. Records show that the amount of lead in his blood was more than eight times the current "call a doctor" threshold. This has had lifelong ramifications—impairing his brain development, landing him on disability, and making him easily manipulated and influenced.

So one night last summer, Marquille possessed a gun and ammunition. He was with a friend who also had a gun, and they were out joyriding. Police tried to stop him. He ran, and was caught. After being incarcerated for more than four months in the state system, his case was brought to federal court. A magistrate judge put him on location monitoring and he has done well, with medication and the support of family and positive friends.

As highlighted below, considering Marquille's personal history, his record on pretrial release, and his months in state custody, a sentence of time served, with continued location monitoring as a condition of supervision, meets the goals of sentencing in this matter.

**Background**

Marquille's story deals with a centuries-long public health crisis, and our society's failure to fully recognize or address it. It's the story of lead.

Lead has been used in plumbing since the Roman Empire, since it's malleable yet also durable and rust-resistant. So it was (and still is) used to make water pipes, especially joints. (The Latin word for lead is plumbum, showing its long-standing link to plumbing, and explaining its chemical symbol.) Lead also tastes a bit sweet, so Romans added it to their wine. Yet even then, reports emerged that lead caused health problems, like colic in children. Nevertheless, it has been widely used in plumbing ever since.

Lead also has been added to paint since at least the 1500s, after scientists discovered that it made paint more durable. But lead paint wasn't generally used indoors until the 1800s. At the end of that century, medical authorities in the United States began formally diagnosing individuals with lead poisoning. Then in the early 20th Century, European nations recognized the connection between lead poisoning and lead paint and banned its interior use. That ban was adopted by the League of Nations in 1922, but the United States refused to go along.

And tragically, given its mild sweetness, lead paint chips have always been attractive to young children. As far back as 1943, researchers concluded that children who ate lead paint chips harmed themselves. Lead poisoning has

established symptoms, stunting growth, harming brain development, and even causing death. Nonetheless, the United Sates didn't begin to phase out the use of interior lead paint until 1971, almost 50 years after most European countries.

Ironically, around the same time that governments and researchers were understanding how lead paint is toxic if consumed, chemists and engineers realized that if you added a form of lead to gasoline, combustion engines ran more smoothly. Sparked by large companies like General Motors, the use of leaded gasoline exploded. And as more and more cars filled the road, especially in the post-World War II era, our environment became saturated with lead. Lead in the air and dirt from burning leaded gasoline was the primary source, but also lead dust and lead paint chips inside homes and businesses, and, intermittently, lead-tainted water.

This had dramatic consequences for society, as a generation of children were lead poisoned. Thankfully, that era started to end in the early 70s, due to the lead paint legislation described above and because the federal government finally began efforts to phase out leaded gasoline. But lead remains a serious problem, especially in urban areas where soil was exposed to the most leaded car exhaust, where lead paint was widely used in housing and homes are deteriorating, and where older lead pipes may be breaking down.[1] Sadly, that describes urban Milwaukee to a "T." And that's where this history intersects with Marquille Wimberly.

Marquille was born in April 1994. His mother, Toya, was a single mother, and the product of another single mother. Toya admits to hanging out with negative peers as a teen, including the father of Marquille's older brother, Freddie. She had several cases in the Milwaukee juvenile court system, and recalls getting arrested for shoplifting multiple times. She went to alternative schools, never graduated, and had Freddie when she was just a teenager.

Not long after, Marquille was born, the product of another relationship. Toya's mother then moved to downstate Illinois to take care of her own mother (Toya's grandmother) leaving her without family support. But instead of following her

---

[1] Lead paint can be safe if left alone—for example, if it is buried under several coats of non-lead paint. Lead pipes may not cause issues either, if the water running through them is properly treated. The crisis in Flint, Michigan, arose when the city failed to properly treat a new water source.

mother, Toya tried to find and pay for her own apartment in Milwaukee. But she couldn't make it work. Facing homelessness, and taking care of two young boys, Toya moved into a shelter. Marquille was about two years' old. Around that same time, Freddie's father being sentenced to prison for a domestic violence case, where Toya had been the victim. Marquille's father, Lamont Howard, had his own criminal record, and wasn't involved in raising him. So when a landlord came by the shelter looking for tenants, and told Toya that he'd take her, despite her only income being welfare and her being a single mom of two kids, she jumped at it. She then moved into a 20-unit building near Holton Street and North Avenue in Milwaukee. The apartment wasn't that well-kept, it was dingy and had paint peeling from the walls, but it was a step up from the homeless shelter.

Yet after a few months at the apartment, Toya began to notice some strange behavior from Marquille. He wasn't as talkative as his brother had been at the same age. And he seemed angry, irritable, nearly all the time. She recalls him getting into frequent fights with Freddie, even biting him unprovoked. So she took him to Children's Hospital. The first visit came in the summer of 1996. *See* Ex. A, Milwaukee Public Schools, IEP Eligibility Checklist at 1 (noting Marquille's hospital visits for lead poisoning, and lead testing levels).

Doctors discovered that Marquille's blood tested at 42 mg/dl for lead. *See id.* The currently accepted "seek medical attention" threshold in the United States is 5 mg/dl, although there is no "safe" level of lead exposure. *See* Centers for Disease Control and Prevention, *Lead: What Do Parents Need to Know to Protect Their Children?*[2] Doctors admitted Marquille to the hospital to undergo "chelation" therapy, a dangerous procedure where substances are introduced to try to leach heavy metals out of a person's body. The chelation process took nearly two weeks, meaning Marquille was hospitalized that entire time. Doctors then released him to Toya, and gave her a follow up appointment a few weeks later. But when she came back, Marquille's lead levels were again dangerously high. *See* Ex. A at 1. He was admitted again for chelation therapy. This pattern then repeated itself as third time. Marquille was released, brought back a couple weeks later, and found again to have dangerously high lead levels. He then underwent chelation once more.

---

[2] Available at https://www.cdc.gov/nceh/lead/acclpp/blood_lead_levels.htm.

Hon. Lynn Adelman
February 25, 2018
Page 5

A year later, still living in the same apartment, Marquille was again found to have extremely high lead levels—33 mg/dl in October 1997, and 24 in December 1997. Ex. A at 1. What Toya eventually realized was that Marquille, being a curious, active toddler, would walk around the apartment, pick up paint chips from the peeling walls, and eat them. Lead, after all, has a slightly sweet taste, and small children love sweets. Toya also recalls that other children in the building had lead poisoning. This fits with public records about that neighborhood.

In December 2016, Reuters gathered lead testing data from around the country and sorted it by census tract. *See* M.B. Pell and Joshua Schneyer, *The thousands of U.S. locales where lead poisoning is worse than in Flint* (Dec. 19, 2016).[3] About 2% of children nationwide test above the 5 mg/dl threshold. In the two census tracts straddling the intersection of Holton and North in Milwaukee, it's 25.13% and 22.66%, about ten times the national average. *See id. below* (this information is



---

[3] Available at https://www.reuters.com/investigates/special-report/usa-lead-testing/.

revealed if you hold your cursor over Census Tracts 107 and 108 on the map included in this article linked to in footnote three). Comparatively, at the height of the Flint, Michigan water crises, about 5% of the children in Flint tested above the 5 mg/dl threshold. And the data used in the map above is from 2010 to 2015. Marquille lived in the neighborhood 14 years earlier, when conditions might have been even worse.

Eventually, the City of Milwaukee shut down the building as unsafe and ordered all the occupants to leave. Several tenants filed a civil suit against the landlord, seeking damages for lead poisoning, but Toya, still in her early 20s, wasn't savvy enough to join.

But she did understand that the repeated, long-standing lead poisoning had affected Marquille. She saw it play out in his life and in his school performance. And she still sees it to this day. For instance, Marquille had consistent behavioral problems in school. *See* Ex. A at 2. He can be impulsive, and has difficulty sitting still. Indeed, he's been diagnosed with ADHD in addition to lead poisoning. He's easily influenced by others, his mood can shift suddenly, and is easily "set off." He also has difficulty reading and writing, and engaging in complex tasks. And it usually takes repeated reminders and mistakes for him to absorb different lessons.



This matches up with the science. It's been known for some time that lead exposure in childhood reduces IQ. Even comparatively low levels of lead can result in a significant and lifelong hit. *See chart, left*. (By this scale, Marquille would have lost about 15 IQ points because of lead exposure).

But lead harms the brain in other ways too. It promotes apoptosis in the brain—that's cell death. The lead molecule is also similar to calcium, so lead blocks the positive effect of calcium on a developing brain. Lead exposure also prevents the formation of myelin, the

sheath that protects the connections between neurons. This means that lead poisoning impairs the connections between brain cells, making the connections in a person's brain work more slowly and less effectively.[4]

What's more, childhood lead exposure has been linked to loss of matter in the brain's prefrontal cortex. This is the part of the brain that's not fully formed until a person's mid-20s, and governs things like emotions, impulse control, and decision-making.[5] In short, lead poisoning can leave a person's brain in a state of permanent adolescence.

Other studies show that lead exposure increases the risk of developing ADHD, even at low levels.[6] All in all, childhood lead poisoning leads to adults with lower IQs, impulse control problems, slow reasoning, and ADHD. This is why some criminologists and researchers believe that the elimination of leaded gasoline is the real reason why the national crime rate declined in the 1990s and has stayed low. A generation of children grew up exposed to less lead, and as they reached adulthood, fewer of them committed crimes. *See generally* Kevin Drum, *Lead: America's Real Criminal Element*, Mother Jones (Feb. 11, 2016);[7] Kevin Drum, *An Updated Lead-Crime Roundup for 2018*, Mother Jones (Feb. 1, 2018) (summarizing recent research)[8]. Accepting this hypothesis, it would also seem to explain why certain cities, like Milwaukee, have stubbornly high crimes rates—because the lead poisoning of children remains an ongoing problem in those areas. *Compare* Pell & Schneyer, *supra* (noting cities where lead poisoning is high, like Cleveland, Baltimore, and Milwaukee); *with* Rich Exner, *Crime rates for U.S. Cities*, Cleveland Plain-Dealer (May 19, 2015) (noting the large cities with the highest crime rates include Cleveland, Baltimore, and Milwaukee).

---

[4] *See generally* Christopher Brubaker *et al.*, *Altered Myelination and axonal integrity in Adults with Childhood Lead Exposure: a Diffusion Tensor Imaging Study*, 30(6) Neurotoxicology 867 (Nov. 2009) (abstract available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2789851/).

[5] Kim Cecil, *et al.*, Decreased Brain Volume in Adults with Childhood Lead Exposure, PLoS Med (May 2008) (available at http://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.0050112)

[6] J.M. Braun, *et al.*, *Exposures to environmental toxicants and attention deficit hyperactivity disorder in U.S. children*, Envtl. Health Perspectives 1904 (Dec. 2006) (Abstract available at https://www.ncbi.nlm.nih.gov/pubmed/17185283)

[7] Available at https://www.motherjones.com/environment/2016/02/lead-exposure-gasoline-crime-increase-children-health/.

[8] Available at https://www.motherjones.com/kevin-drum/2018/02/an-updated-lead-crime-roundup-for-2018/.

Turning back to this case, what all this means is that from an early age Marquille was permanently disabled. His mother realized this, and with help applied for disability benefits. Marquille was given those benefits when he was in kindergarten and still receives them now. They are currently his only source of income. The Milwaukee Public Schools also recognized his disability, and placed him in special education classes throughout his schooling. Unfortunately but unsurprisingly, his school records note a long history of disruptive conduct and poor academic performance. Late in high school, he's math and writing skills were at the level of a third grader, meaning as a 17-year-old Marquille was on par with an eight-year-old. *See* Ex. B, Excerpts from IEP. (Now years out of school, his reading ability is likely even worse for lack of practice.) Marquille was also shot two years ago and has a bullet lodged in the back of his head. PSR at ¶68. Given that most bullets are lead, one wonders if this injury or the bullet itself has further harmed his cognitively abilities. *See, e.g.*, Susan Scutti, CNN, *Bullet fragments linked to lead poisoning, CDC study says* (Feb. 13, 2017).[9]

Since individuals with serious lead poisoning have impaired executive function, it's no surprise that they are impressionable, easily distracted, and misled by bad influences. More than most people, they reflect their environment. And Marquille's environment hasn't been great, even outside the lead poisoning. His mother has always been poor, and moved their family frequently. Marquille's older brother, Freddie, suffers from serious mental health issues, which occupied their mother's time and attention while they were growing up. Marquille also has four other maternal half-siblings, all younger than him. These brothers and sisters took up even more of his mother's attention, meaning that there was even less left over for Marquille himself. And his father never had any influence with his life.[10]

But Marquille isn't a bad-natured person. He's friendly, jovial, and eager to please. *See* Ex. B at 1. So it's no surprise that Marquille's teachers reported that he did well in one-on-one instruction, when he finally got the undivided attention of a positive

---

[9] Available at http://www.cnn.com/2017/02/13/health/bullets-blood-lead-study/index.html.
[10] Marquille's father was in and out of prison for year, and when back in the community made no effort to parent or support his son. *See* PSR at ¶58 (noting that Marquille's father is serving a seven-year federal sentence for distribution of heroin, and was revoked for ten years in the state system).

adult. *See* Ex. A at 2; Ex. B at 1. But when put in a regular classroom, with other unruly students, his behavior broke down.

His criminal history reflects this pattern. All of his juvenile cases involve foolish, poorly thought out crimes, carried out in groups. *See* PSR at ¶¶33-36. Other offenses involve swift, irrational mood swings. For instance, his criminal history points stem from cases involving (a) throwing a shoe at his aunt, *see id.* at ¶37, (b) waving a knife at his mother because she wouldn't give him $20, *id.* at ¶38, and (c) yelling at and physically harming a girlfriend, apparently because she had been out too late, *see id.* at ¶41. These aren't the actions of a mature adult. And admittedly, neither were his actions in this case.

Indeed, the fact that Marquille is not, cognitively, an adult is reflected by his work history. He has none, despite being 23 years' old. Counsel and his pretrial services officer have talked with him about volunteering, to surround himself with good influences and get some initial experience. But he has no idea how to go about finding a volunteer position.

Nevertheless, Marquille seems to have learned from his most recent experience. The lesson that he cannot ever possess a firearm seems to have sunk in. He also appears to have learned that if he's around bad influences, he will pay a price for it. So he's complied with his location monitoring rules, avoided drugs, and restricted himself to people he can trust—like his mother, Toya, and his girlfriend, Kayla Bruce, who works at a call center and has no criminal history. He now comes before the Court for sentencing.

**Argument: a sentence of time served and six additional months on location monitoring meets the goals of sentencing.**

Because of lead damage, Marquille's brain is essentially in a child-like state. He is 23, so there's some neurological development yet to come. But he likely will never have a healthy, fully formed adult brain. He will remain easily influenced, confused, and frustrated. Where others will see a clear, correct decision to make, Marquille may struggle to understand what he should do. So what should the Court do, with this person who has a child's brain but a grown man's body?

*The guidelines are properly 15 to 21 months.*

All federal sentencings begin with the guidelines, so the Court must calculate them correctly. As noted in the addendum to the PSR, the probation office incorrectly counts a Milwaukee Municipal Court marijuana violation for one criminal history point. The probation office itself acknowledges that this municipal ordinance is broader than the applicable state law, so a violation of the municipal ordinance is not, by its terms, "also a violation of state criminal law." As a result, this violation does not count for points.

This Court made that clear in United States v. Moore, 288 F. Supp. 2d 955 (E.D. Wis. 2003). And the Tenth Circuit has made the point twice in a pair of recent decisions. *See* Doc. 21 at 4 (citing to *United States v, Abeyta*, 877 F.3d 940 (10th Cir. 2017), and *United States v. Saavedra*, 523 F.3d 1287 (10th Cir. 2008)). The analysis is identical to the categorical approach used when determining whether state crimes fit federal recidivism statutes. Here, the municipal violation covers conduct that is not criminalized by state law. So it does not count for points under the plain language of the guidelines.

Without that additional criminal history point, Marquille is in Criminal History Category III, and his guideline range is 15-21 months. This is the correct guideline range in this matter.

*The Court should impose a structured sentence, combining the four-and-a-half months of jail time with an extended period of location monitoring, and additional conditions of supervision.*

Of course, this Court is not bound to the guideline range. But it does give a somewhat useful starting point—specifically, that the Commission believed that someone with this criminal history and offense could be reasonably punished by a sentence of just over a year. Marquille has already served more than four months in prison. Since his release on bond in early October, he has been on location monitoring. By the time of sentencing, it will have been nearly five months. Combined with his period of pretrial detention, this equates to over nine months of physical restriction. And ordering an additional six months of location monitoring, combined with these nine months, would result in 15 total months of

some form of confinement. This is what the defense requests: essentially a modified guideline sentence.

That sentence is appropriate for multiple reasons. First, the intervention of the criminal justice system has had a positive effect. Prior to his arrest in May 2017, Marquille had been off his medication and out of touch with his mother and his family; he was essentially running the streets. That explains why he was driving around at night in a stolen car, armed, with another armed felon. After he was chased down and caught that night, he suffered immediate consequences. He was incarcerated for four months, prosecuted federally, and then released to house arrest where he was required to move in with his mother. Since then, he has had no issues in five months. He has complied with location monitoring, so much so that it was reduced to curfew status. With the help of his mother, he reapplied for Social Security and restarted his disability benefits. He underwent a psychological assessment arranged by the probation office. And he began taking medication again, which his mother believes helps make him calmer and more deliberate. What this record reflects, is that the combination of jail time and pretrial supervision has put Marquille in a stable place—where we as a society want him to be. Disrupting this stability by sending Marquille back to prison makes little sense. Instead, the Court can build off of it, keeping him on location monitoring (since he seems to have benefited from it) and requiring that he participate in programming. For instance, he would seem to benefit from the probation office's cognitive intervention program, and perhaps from a workplace training program for people with disabilities.[11] Such programs would allow Marquille to move further forward—away from the negative influences of the street, and toward great self-sufficiency.

The other option is to send him back to prison. Certainly, his offense isn't minimal. So the more punitive § 3553(a) factors reflexively support a prison sentence. On the other hand, although Marquille tried to flee, there's no evidence that he used the firearm to further more serious offenses, like robbery or drug trafficking. And returning Marquille to prison also undermines other goals of sentencing—particularly the need to protect the public and promote his rehabilitation. Research shows that prison time actually increases the odds of recidivism. And as noted,

---

[11] For instance, Goodwill seems to have an appropriate local program. *See* Goodwill.com, *Training, Jobs and Supportive Services* https://www.goodwillsew.com/training-jobs-support-services/employment-services.

Marquille is naïve and easily influenced. Putting him into an adult prison for the first time would expose him to negative influences, teaching him not how to behave in society, but rather how to be a criminal. So a prison sentence would appear to increase the risk of recidivism, and not protect the community in the long run.

In addition, the defense's requested sentence recognizes Marquille's somewhat reduced culpability. A cognitively disabled person is, categorically, not as culpable as a person with a fully functional brain (who makes more informed decisions to break the law). And a cognitively disabled person may need more time to learn new information, and for life lessons to be absorbed. In Marquille's case, he certainly was told at some previous point that he couldn't possess a firearm. But that warning may not have sunk in. Now he has suffered the consequences. And he may have needed these consequences for that warning to become more than mere words—for he now understands that possessing a firearm leads to arrest and imprisonment.

**Conclusion**

In all, the defense requests a total sentence of time served and a period of supervised release, with the first six months to be served on location monitoring. Combining his jail time and his time on pretrial location monitoring with these additional six months results in of 15 months physical restraint, which is within the range of imprisonment suggested by the guidelines. The defense also requests conditions including participation in a cognitive intervention program and enrollment in an appropriate work training program, both done at the discretion of the probation office. Such a sentence will allow Marquille to stay on his current positive path, while taking additional steps forward that will reduce his risk of recidivism. The additional location monitoring will have the added effect of communicating to him that his offense was serious while also keeping the pressure on him, even after sentencing, to continue to make the right decisions. This sentence strikes the right balance for this defendant, this offense, and these circumstances.

Thank you for your attention to this matter.

Hon. Lynn Adelman
February 25, 2018
Page 13

Respectfully submitted,

/s/ *Anderson M. Gansner*

AMG/lc